837 So.2d 464 (2002)
INSERVICES, INC., f/k/a Managed Care USA Services, Inc., a North Carolina corporation, and Mippy Heath, individually, Appellants,
v.
Rodrigo AGUILERA, and Patricia Lower Aguilera, his wife, Appellees.
No. 3D01-867.
District Court of Appeal of Florida, Third District.
December 26, 2002.
Certification Denied February 12, 2003.
Rumberger, Kirk & Caldwell, and Joshua D. Lerner, and David J. Pyper, for appellants.
Friedman & Friedman; Lauri Waldman Ross, for appellees.
Before GERSTEN, and SHEVIN, JJ., and NESBITT, Senior Judge.

ON MOTION FOR REHEARING
PER CURIAM.
The motion for rehearing is granted. We withdraw the opinion issued October *465 31, 2001, and substitute the following opinion.
Appellants, Inservices, Inc., f/k/a Managed Care USA Services, Inc., and Mippy Heath (hereafter collectively referred to as "defendants"), appeal the denial of their motion to dismiss claiming they are entitled to workers' compensation immunity. We agree and reverse.
Appellant, Inservices, Inc., f/k/a Managed Care USA Services, Inc. ("Inservices") provided workers' compensation benefits to the employer of appellee Rodrigo Aguilera ("Aguilera"). Aguilera was injured in a work-related accident when he was struck by an electric fork lift in April of 1999. Inservices referred Aguilera to a workers' compensation clinic where he was treated and eventually discharged to return to work with restrictions.
A few weeks later, Aguilera began to complain of kidney and bladder pain. After examination by two doctors who both recommended that Aguilera not return to work, Aguilera's workers' compensation attorney requested examination and treatment by a board certified urologist. Inservices denied the request claiming the injury was not work-related.
In June of 1999, Aguilera notified Inservices that he was passing feces through his urine and was in need of immediate urological care. Three days later, Aguilera was advised that his workers' compensation benefits were being terminated. Inservices denied the emergency request for medical care claiming it was not medically necessary.
Several weeks later, Aguilera's treating physician again advised Inservices that the need for urological care was urgent and that his condition had deteriorated. The results of a retrograde urethogram revealed Aguilera had a hole in his bladder. A new case manager was assigned to Aguilera's case, defendant/appellee Mippy Heath ("Heath"), however, Heath rejected Aguilera's request that a general surgeon perform immediate emergency surgery on his fistula. She insisted on a second opinion and the administration of tests which, according to Aguilera, were painful and contraindicated by his medical condition. Heath thereafter sent Aguilera to a gastroenterologist.
After seeing six doctors in addition to his initial treating physician, and after urinating feces and blood for over ten months, Aguilera's surgery was authorized on March 22, 2000. Aguilera filed suit against the defendants, seeking damages for common law bad faith and breach of contract against Inservices, for intentional infliction of emotional distress against Inservices and Heath, and seeking a declaration that the workers' compensation exclusivity rule is unconstitutional to the extent it eliminates claims for subsequent malfeasance of a carrier.
The defendants moved to dismiss on various grounds including the defense of workers' compensation immunity under the Workers' Compensation Act (the "Act"). The trial court denied the motion finding that intentional, outrageous conduct on the part of the defendants escalated the workers' compensation claim into a tort action.
We empathize with Aguilera's plight in resolving his medical problems. However, established precedent and the plain language of the Workers' Compensation Act requires that we reverse.
This Court previously established that the test to determine if workers' compensation bars a tort action, is whether the injury for which a plaintiff seeks recovery is covered by the Workers' Compensation Act. See Old Republic Ins. Co. v. Whitworth, 442 So.2d 1078 (Fla. 3d DCA 1983). *466 Simply stated, if the injury is covered by the Act, a separate tort action in circuit court is barred.
Thus, in Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1078, we dismissed the plaintiff's tort claim because workers' compensation provided a remedy for the allegations of delayed payment and bad faith. In so doing, we specified that: "[A] compensation claimant cannot avoid the exclusivity of the Act and transform a delay in payments into an actionable tort cognizable in the Circuit Court simply by calling that delay outrageous, fraudulent, deceitful or an intentional infliction of emotional distress." Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1079. See also Sheraton Key Largo v. Roca, 710 So.2d 1016 (Fla. 3d DCA 1998)(workers' compensation immunizes a carrier from a tort action based on alternative allegations of outrageous, fraudulent and deceitful conduct or for intentional infliction of emotional distress committed while handling a claim); Montes de Oca v. Orkin Exterminating Co., 692 So.2d 257 (Fla. 3d DCA 1997)(allegations of delay, outrageous misconduct, and intentional infliction of emotional distress in handling claim, fall within exclusive jurisdiction of workers' compensation judge).
We further noted the history and objectives of the workers' compensation laws, and expressed our concerns that "if delay in providing services could become the subject of an independent suit, the legislatively designed exclusivity of the act would be destroyed." Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1079 (citing Sullivan v. Liberty Mut. Ins. Co., 367 So.2d 658 (Fla. 4th DCA 1979), cert. denied, 378 So.2d 350 (Fla.1979)). The legislative intent expressed in the workers' compensation law is that a claimant's exclusive remedy for misconduct in the rendition of medical care lies solely with the commission, and not through independent third party court actions.[1]
This is not to say that a compensation carrier is immune from all intentional torts. The workers' compensation scheme does not immunize a compensation carrier from wrongdoing which occurs independently of its claims handling. Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992) (adjuster who fraudulently edited the statement of a claimant which results in the denial of benefits constitutes an intentional act independent of the handling of a workers' compensation claim); cf. Associated Indus. of Fla. Prop. & Cas. Trust v. Smith, 633 So.2d 543 (Fla. 5th DCA 1994) (it is not an independent tort for a workers' *467 compensation carrier to withdraw benefits, as a wrongful termination can be remedied under the statute). Thus once a trial court determines a plaintiff does have a remedy under the Workers' Compensation Act, the only remaining issue to be considered prior to dismissal is whether the plaintiff's allegations involve wrongdoing independent of the workers compensation claim.
Aguilera does not argue that he is without remedies under the Act. And we note the Act does contain provisions addressing his allegations that the defendants lied to him concerning available benefits, refused to schedule appointments with physicians, wrongfully attempted to deprive or ignored his request for medical treatment and insisted upon tests to evaluate his medical condition which were contradicted by his medical condition.[2] Aguilera's primary contention is that the exclusivity provisions of the workers' compensation statutes do not bar his intentional tort claim because the defendants' conduct was outrageous and resulted in injuries separate and distinct from the work related injury[3]. We disagree.
*468 In order for an independent tort to exist, there must be facts that are distinct from a breach of contract. See HTP, Ltd. v. Lineas Aereas Costarricenses S.A., 685 So.2d 1238 (Fla.1996); Invo Florida, Inc. v. Somerset Venturer, Inc., 751 So.2d 1263 (Fla. 3d DCA 2000); Here, all of Aguilera's allegations deal with the manner in which his claim was handled by the defendants pursuant to the workers' compensation insurance contract. Since all of the allegations relate to the defendants alleged breach of contractual obligations under the workers' compensation policy, no independent acts have been alleged and thus there is no independent tort. See Sullivan v. Liberty Mut. Ins. Co., 367 So.2d at 658. Aguilera's injuries arising from any delays in medical treatment were incidental to his original injury and compensable by his employer's compensation carrier.[4]See Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1079.
In conclusion, we find the allegations in the present case are insufficient to come within any exception to the statutory immunity provided by section 440.11, Florida Statutes (2000). See Sheraton Key Largo v. Roca, 710 So.2d at 1016; Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1078; Sullivan v. Liberty Mutual Insurance Co., 367 So.2d at 658. Accordingly, the trial court erred in finding the cause of action was not barred by the Act, and the case is hereby reversed and remanded with instructions to enter a final order dismissing the complaint.
Reversed and remanded with instructions.
GERSTEN, J., and NESBITT, Senior Judge, concur.
SHEVIN, J., dissenting in part, concurring in part.
I dissent from the opinion granting rehearing.
As a matter of law, affirmance is required in this case as to the intentional infliction of emotional distress claim.[5] The workers' compensation immunity carrier has clearly committed an intentional tort, which brings this case outside the ambit of the traditional workers' compensation immunity, and renders the carrier liable in an intentional tort action. I would affirm the denial of the motion to dismiss the Aguileras's amended complaint on the intentional infliction of emotional distress count.
The majority opinion focuses on the damages suffered and concludes they are "claim delay" damages, therefore entitling the carrier to immunity. However, the complaint appropriately pleads a cause of action for intentional infliction of emotional distress and thus asserts an intentional *469 tort that falls outside the protection of the workers' compensation immunity.
The standard of review for examining an order denying dismissal is well-settled.
A motion to dismiss tests whether the plaintiff has stated a cause of action. Because a ruling on a motion to dismiss for failure to state a cause of action is an issue of law, it is reviewable on appeal by the de novo standard of review. When determining the merits of a motion to dismiss, the trial court's consideration is limited to the four corners of the complaint, the allegations of which must be accepted as true and considered in the light most favorable to the nonmoving party.
Bell v. Indian River Memorial Hospital, 778 So.2d 1030 (Fla. 4th DCA 2001) (citations omitted). The allegations in the amended complaint, as set out below, sufficiently demonstrate that the Aguileras have stated a cognizable claim for intentional infliction of emotional distress that survives dismissal on workers' compensation immunity grounds.

Facts
Any summary of the facts works an injustice to the events leading up to the lawsuit, and pale the magnitude of the injuries intentionally inflicted upon the Aguileras. Therefore, as in the original panel opinion, I rely on the factual recitation in the Aguileras's amended complaint:
FACTS COMMON TO ALL COUNTS
8. On April 21, 1999, plaintiff Aguilera was injured at a Publix warehouse on NE 183rd Street when an electric fork lift operated by a Publix employee struck him and pushed him against a pallet. Plaintiff suffered immediate injuries to his back and right leg and was transported to Palmetto Hospital Emergency room. Palmetto medical records reflected, that at the time, that plaintiff simply had blood in his urine. An emergency room physician diagnosed an infection and gave the Plaintiff a prescription for necessary medication.
9. Immediately following his injuries, Plaintiff received medical care supervised and controlled by Managed Care USA Services, Inc., n/k/a Inservices, Inc. defendant here, and its employees and agents. On instructions of the Defendant, Plaintiff was referred to a workers' compensation clinic and, on May 12, 1999, was discharged to return to work with restrictions.
10. Subsequently Plaintiff began to complain of kidney and/or bladder pain. On May 24, 1999, plaintiff's workers' compensation attorney filed an initial "request for assistance," requesting inter alia Inservices' authorization for a board certified urologist to examine and treat the Plaintiff. From that point forward, the defendants did everything in their power to block medical treatment that it had actual notice Plaintiff needed, and by doing so recklessly endangered plaintiff's life, and engaged in a pattern of action substantially certain to bring about his death.
11. Inservices first denied Plaintiff any authorization for urologist treatment, ostensibly because it was not "work related."
12. On June 17, 1999, Inservices was notified that Plaintiff's urological care was now an "emergency" because the Plaintiff's urine had begun to smell like feces.
13. On June 21, 1999, Plaintiff was advised that his workers' compensation benefits were being terminated as of July 9, 1999, notwithstanding the report of two doctors, including Defendant's own doctor that he should not return to work.

*470 14. On June 25, 1999, Inservices blocked Plaintiff's receipt of the prescription medication prescribed to him by the hospital emergency physician, for his urinary tract infection.
15. On June 30, 1999, the defendant denied Plaintiff's emergency request for the care of a urologist, this time on the ostensible basis that it was not "medically necessary." At this time defendant had within its possession medical care information showing directly the opposite.
16. On July 7, 1999, Inservices was advised by Plaintiff's treating physician that his need for a urological consult was now "urgent," and that his condition was "deteriorating."
17. On July 9, 1999, Defendant's own doctor, Alan Dansky, gave Plaintiff prescriptions for various urinary tests to take place, and the appointments were scheduled by Defendant's own nurse.
18. On July 29, 1999, Defendant's adjuster unilaterally canceled some of this medical testing. Testing which was performed (a retrograde urethrogram) reflected that Plaintiff had a fistula or a hole in his bladder.
19. On August 6, 1999, Defendant Mippy Heath introduced herself as defendant's new "case manager." She was specifically advised not to deal with Plaintiff directly and agreed not to perform on site case management services directly, or to interfere with plaintiff's care.
20. On August 19, 1999, Plaintiff's counsel alerted Defendant's adjuster that he needed a general surgeon to perform emergency surgery on the fistula. Defendant's new nurse consultant/case manager Mippy Heath refused to authorize the emergency surgery, and insisted on a second opinion.
21. On August 25, 1999, notwithstanding her agreement with Plaintiff's counsel, Mippy Heath showed up for the Plaintiff's urology appointment with Dr. Campeatore, the defendant's IME urologist. Ms. Heath then advised the Plaintiff to lie to his workers' compensation lawyer, and tell his lawyer that she was not at the doctor's office.
22. Defendant insisted on the administration of tests that were painful to Plaintiff and contraindicated by his then-present medical condition. Defendant then used Plaintiff's refusal to submit to these painful tests as a further excuse to refuse Plaintiff's now critical, surgical treatment.
23. By November 4, 1999, defendant's own case manager and nurse practitioner agreed that plaintiff needed immediate hospitalization for surgery. Defendant's adjuster overruled its nurse because it ostensibly wanted a second opinion from a general surgeon. However, Defendant did not authorize plaintiff's consult with a "general surgeon," but instead sent him to a gastroenterologist. At this point in time, Plaintiff had been urinating feces and blood for over six months.

(Emphasis added).
Based on these allegations, the Aguileras sued the workers' compensation carrier/administrator, Inservices, Inc., and Mippy Heath, the case manager [collectively "defendants"]. The complaint asserted causes of action for common law bad faith, breach of contract, declaratory judgment and intentional infliction of emotional distress. Defendants filed a motion to dismiss the complaint asserting workers' compensation immunity. The trial court denied the motion finding that the acts alleged fell outside the scope of the immunity.

*471 Workers' Compensation Immunity

Florida's workers' compensation scheme was designed "to assure the quick and efficient delivery of disability and medical benefits to an injured worker and to facilitate the worker's return to gainful reemployment at a reasonable cost to the employer." § 440.015, Fla. Stat. (1999). In exchange for affording employees these benefits, an employer is shielded by statutory immunity from suit. § 440.11, Fla. Stat. (1999). Nevertheless, that immunity does not shield an employer from lawsuits alleging intentional torts. Turner v. PCR, Inc., 754 So.2d 683, 684 (Fla.2000); Eller v. Shova, 630 So.2d 537, 539 (Fla.1993).
The carrier accurately represents the well-accepted proposition that absent an act independent of handling a claim, no tort action can be brought against a workers' compensation insurance carrier. Old Republic Ins. Co. v. Whitworth, 442 So.2d 1078 (Fla. 3d DCA 1983); Montes de Oca v. Orkin Exterminating Co., 692 So.2d 257 (Fla. 3d DCA), review denied, 699 So.2d 1374 (Fla.1997). However, the facts pled in the amended complaint, which must be accepted as true, demonstrate that this case goes well beyond mere claims-mishandling allegations and asserts independent acts that rise to the level of an actionable intentional tort.
In Turner v. PCR, Inc., 754 So.2d 683, 684 (Fla.2000), the Florida Supreme Court "reaffirm[ed] the existence of an intentional tort exception to an employer's immunity, and h[e]ld that the conduct of the employer must be evaluated under an objective standard." The Aguileras's facts, evaluated under the Turner standard, demonstrate that they have stated a cause of action for intentional infliction of emotional distress, that divests the carrier of immunity.
The facts alleged in the amended complaint do not describe a carrier who "makes the intentional decision to terminate benefits or takes some other intended action to adjust a claim[.]" Rather, the Aguileras's amended complaint asserts intentional tortious behavior by Inservices and by the case managerwho went so far as to show up at Aguilera's urologist appointment and suggest that he lie to his attorney and say she was never there.
As the majority correctly posits, under Old Republic, if an injury is covered by the Act, a separate tort action cannot be maintained. However, that does not justify reversal. Nowhere does the Act provide recovery or a remedy for the intentional infliction of emotional distress asserted by the Aguileras. The allegations here clearly go beyond mere assertions of willful delays in payment, see Old Republic, or assertions that injuries were exacerbated because of payment or service delays. Sheraton Key Largo v. Roca, 710 So.2d 1016 (Fla. 3d DCA), review denied, 728 So.2d 204 (Fla.1998); Sullivan v. Liberty Mut. Ins. Co., 367 So.2d 658 (Fla. 4th DCA), cert. denied, 378 So.2d 350 (Fla. 1979). Here, however, these allegations of intentional torts by the defendants constitute conduct not compensated or shielded by workers' compensation immunity. See Turner; Cunningham v. Anchor Hocking Corp., 558 So.2d 93 (Fla. 1st DCA), review denied, 574 So.2d 139 (Fla.1990). The carrier here took intentional action, beyond the conduct shielded by the immunity and committed an intentional tort on the injured claimant.
The Florida Supreme Court "has recognized an intentional tort exception to the workers' compensation statutory scheme.... [W]orker's compensation law does not protect an employer from liability for an intentional tort against an employee." Turner, 754 So.2d at 686-87. The allegations in this amended complaint satisfy the "bases for an employee to prove *472 an intentional tort action against an employer." Id. The amended complaint clearly alleges that defendants "intentionally engaged in conduct that was substantially certain to result in injury or death." Id. This is sufficient to survive a workers' compensation immunity dismissal motion.
In this case, as in Connelly v. Arrow Air, Inc., 568 So.2d 448, 451 (Fla. 3d DCA), review denied, 581 So.2d 1307 (Fla. 1990), the behavior exhibited by defendants meets the test set in Turner, for an employee to prove an intentional tort under the exception: conduct that will "to a substantial certainty" cause serious injury to, or the death of the employee. Turner; Cunningham. This court has observed that "the cases that have actually applied the Turner doctrine, especially Turner itself, have characteristically involved a degree of deliberate or willful indifference to [the] employee...." Pacheco v. Florida Power & Light Co., 784 So.2d 1159, 1163 (Fla. 3d DCA 2001). The defendants here exhibited the same deliberate and willful indifference to Aguilera. Hence, the immunity may not extend to shield defendants from the intentional infliction of emotional distress claim.
Contrary to the majority's assertion, the imposition of criminal penalties on the carrier, suspension of the carrier's license, penalties for late payments, attorney's fees, dispute resolution procedures, or further procedures to dispute IME requests may punish the carrier or expedite a claim process but those measures do not compensate Aguilera for the injuries he suffered as a result of the carrier's intentional wrongful acts. The carrier's actions including alleged lies as to available benefits, refusal to schedule physician appointments, attempts to deprive him of medical care, and insistence upon tests contraindicated by his medical condition amount to intentional wrongful actions distinct from its breach of contract. As to the case manager, as in Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992), Heath's acts of showing up at Aguilera's urologist appointment, and demanding that he lie to his attorney about her presence to cover up her actions, amount to intentional torts, independent of handling the workers' compensation claim. Here, as in Sibley, the independent tort should not be blocked by the improper application of the immunity.
The majority opinion ignores the import of Turner and apparently agrees with defendants' argument that once an employee files a claim, the employee has already been injured, and the carrier is free to behave in any manner it desires. I cannot fathom that this was the intent of the legislature in creating the workers' compensation scheme and I decline to say so here.
I would affirm the denial of dismissal on the intentional infliction of emotional distress claim.
NOTES
[1] As noted in Sullivan v. Liberty Mut. Ins. Co., 367 So.2d at 660 (quoting Noe v. Travelers Ins. Co., 172 Cal.App.2d 731, 342 P.2d 976 (1st Dist.1959)), if a carrier is liable for all intentional torts which occur after a workplace injury, the present workers' compensation system would be effectively eliminated:

"if delay in medical service attributable to a carrier could give rise to independent third party court actions, the system of workmen's compensation could be subjected to a process of partial disintegration. In the practical operation of the plan, minor delays in getting medical service, such as for a few days or even a few hours, caused by a carrier, could become the bases of independent suits, and these could be many and manifold indeed. The uniform and exclusive application of the law would become honeycombed with independent and conflicting rulings of the courts. The objective of the Legislature and the whole pattern of workmen's compensation could thereby be partially nullified."
This reasoning is further supported not only by Florida case law, but by cases from numerous other jurisdictions which have addressed allegations of flagrant interference by a carrier in rendition of medical care, and which have all concluded that the worker's sole remedy lay in compensation proceedings under the Act. See Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1078, and cases cited therein.
[2] If a carrier "lies" regarding available benefits, such statements constitute a criminal offense and subject the carrier to penalties under section 440.105, Florida Statutes (2000). The Department of Insurance is authorized to revoke or suspend the authority of a workers' compensation carrier for violation of Section 440.105. See § 440.106(3), Fla. Stat. (2000). Damages for bad faith are also authorized by the Act. See Florida Erection Serv., Inc. v. McDonald, 395 So.2d 203 (Fla. 1st DCA 1981).

A claimant has a number of remedies if a workers' compensation carrier wrongfully attempts to, or deprives or ignores, a request for medical treatment. Section 440.20, Florida Statutes (2000), sets a deadline for the timely payment of compensation claims and establishes penalties for late payments. Pursuant to section 440.34(3), Florida Statutes (2000), a claimant can recover attorneys' fees from the carrier in a claim for medical benefits. Further, section 440.192, Florida Statutes (2000), provides a procedure for resolving any benefit disputes between a carrier and a claimant and sets strict deadlines for dispute resolution.
A carrier is entitled to request an independent medical examination concerning compensibility or medical benefits. See § 440.13, Fla. Stat. (2000). However, if a claimant believes the exam would be inconsistent with his medical condition, he can seek relief from a judge of compensation claims who has the power to deny a carrier's request. See Watkins Eng'r & Constructors v. Wise, 698 So.2d 294 (Fla. 1st DCA 1997); Fla. R. Work. Comp. P. 4.065. Aguilera thus does have remedies under the Act.
[3] The dissent relies on Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), to support their claim that Inservices be denied the immunity provided by the Act. However, Turner is distinguishable from the instant case.

Turner involved the continued use of a chemical, TFE by an employer, PCR, who had advanced knowledge of TFE's ultrahazardous nature. In fact, the manufacturer of TFE, notified PCR of its intention to discontinue supplying TFE throughout the United States because of the inherent danger and the high risk of injury of using TFE. In addition, PCR had first hand knowledge of the high risk associated with handling TFE because there had been at least three other similar uncontrolled explosions in less than two years at PCR's chemical plant.
PCR ignored the warnings and danger signs and continued to allow its employees to use TFE in unsafe procedures because PCR needed to meet a fast approaching contractual deadline. As a result, one employee died and another received serious injuries in an explosion caused by TFE.
The injuries in Turner, can be traced directly to the grossly negligent actions of PCR. If not for PCR's decision to continue to use TFE, the employees would not have been injured.
In contrast, Inservices had no part in causing Aguilera's injuries. Aguilera would have needed medical care with or without Inservices's alleged misconduct. Thus, there is no separate act, independent from Inservices's handling of the claim, which injured or "to a substantial certainty" would have caused Aguilera's injuries. Furthermore, as noted prior, other remedies for Aguilera's claims are provided for by the Act.
[4] Aguilera's argument that a carrier does not have immunity for acts which occur after a workplace injury, contradicts the obvious intent of section 440.11(4), Florida Statutes (2000), as well as common sense. Section 440.11(4) extends immunity from liability to the employer's workers' compensation carrier. Thus a carrier is immune from tort liability for acts taken to discharge its obligations under the Workers' Compensation Act. These obligations would necessarily include the adjustment of claims. The adjustment of a workers' compensation claim presupposes an injury has already occurred, because if a worker has not already been injured, there would be no claim to adjust. If we were to adopt Aguilera's reasoning, the result would be an effective stripping of all immunity because a carrier must necessarily act in the adjustment of a claim after an injury has already occurred. This is simply not a common sense construction and would contradict the intent of the statute, as well as encourage a multiplicity of collateral lawsuits.
[5] However, dismissal of the bad faith, breach of contract and declaratory judgment counts is appropriate.